So we would like a road map as to your plans here. I think, Your Honor, John Lemon for Paul Baker. I think what we're doing, if everybody agrees, is I was going to go for seven minutes and then I think it sort of breaks down. We do have additional time. I thought if you could do the ten that you wanted at that time. Oh, I didn't realize we had additional time. What is the order? I said at the beginning that we were going to give you 30 minutes. Oh, okay. I'm sorry. I didn't hear that. And I asked you all to get together and to discuss it, but apparently you didn't. I'm sorry. I did not hear that. Apparently I'm doing ten minutes then. Okay. So you're first. I'm first for Paul Baker. Then what? If I may. Greenhouse second. Okay. Then what? It's just helpful because I will slightly look out for everybody else's interest. Go ahead. Okay. You're for which? Nelson. So you're third. Four? Okay. All right. And then what are... You only need one. Okay. All right. This is helpful. And let us begin then with Mr. Littman. Thank you. Good morning, Your Honors. Again, John Littman for appellate Paul Baker. Littman. I'm sorry. Littman. Okay. Your Honors, Mr. Baker's conviction should be reversed because the trial court broadened the conduct, the possible basis for conviction by instructing the jury on a diluted theory of liability that was neither presented to the grand jury nor returned in the indictment. And because this instruction expanded the range of conduct for which Mr. Baker could be found guilty, it therefore constitutes a constructive amendment which requires automatic reversal. And in the alternative, the second issue I would like to address is that the district court erred in calculating Mr. Baker's criminal history category. He should have been in criminal history category 5 with the guidelines range of 210 to 262 months instead of category 6 with the range of 292 to 365 months. But even with that correct range, if I could start with your sentencing argument for a moment, Mr. Baker's sentence was well below the guidelines that would have applied even if it had been the correct calculation of the criminal history. What do we do with that? That's correct, Your Honor. And frankly, I just reviewed the government's 28-J letter where they acknowledged that my interpretation, Mr. Baker's interpretation of application note 11 is correct. Apparently, they're still making that argument that the sentence was nonetheless reasonable. And I've not had a chance to... I think it's a 30-month difference. He actually got 194 months. I mean, from the bottom end of the respective guideline ranges. Okay. And I can't do math very well, but that sounds right. But in any event, I cited United States v. Cardi in the opening brief, and I think it's pretty axiomatic, excuse me, at this point, that if there is an error in calculating the guidelines, that is a procedural defect, and the court stops and does not then consider whether the sentence... There seems to be some very limited exception, but the limited exception seems to be to a circumstance in which the judge basically covers himself and says that even if I'm wrong, I would do the same thing otherwise. But that didn't happen here, did it? Right. That did not happen. And furthermore, doing some research last night, I intend to file a 28-J on this, but this court has repeatedly held that even where there is an error in the guidelines calculations and the court imposes a guideline sentence or even a below-guideline sentence, that is still reversible error, because the starting point is an accurate guidelines determination. As I understand it, there are limited exceptions, but a limited exception, which is where we know what would happen. Right, because the district court is in the position of having to justify the degree of the variance. And so I just wanted to point out that within... I can give you the sites, but I will file a 28-J. But within the last 18 months, this court has held on plain error review that even though there was a sentence that landed within the guidelines or was well below the guidelines, the error in calculating the guidelines themselves warranted reversal for sentencing. But that's a limited remand for the purpose of applying the correct calculation of the guideline sentence and then figuring out whether that affects the extent of the variance downward, right? Well, that may be the way it works out. My reading of the cases is that it's a de novo sentencing procedure. I could be wrong on that, but I think it's that the district court entertains all the arguments again. Formerly, let's assume you're right. Remand had an open record unless we say otherwise. I believe that. So let's assume you're right. Isn't that the likely outcome in the district court? It may very well be, but I think certainly in this case, the district court believed Mr. Baker was a six, and I think he had to justify the extent of his variance. All right. Do you want to go to your other points? I do, Your Honor. Thank you. The one thing that's been consistent, I should say at the outset that with respect to constructive amendment and variance, the cases certainly within the district, I mean, within the circuits, but also within the Ninth Circuit, there is some inconsistent language in all the cases. But the one thing that has been the consistent theme is that a district court cannot broaden the scope of conduct that can sustain a conviction beyond that which was returned in the indictment. That was in Sterone. It was in the Miller case, which clarified Sterone. It was reiterated by this court in Wilbur two years ago, and again in United States v. Ward just a couple of months ago. And in Ward, the court specifically said that it is the exclusive prerogative of the grand jury finally to determine the charges. And once it has done so, neither a prosecutor nor a judge can change the charging part of an indictment to suit his or her own notions of what it ought to have been or what the grand jury would probably have made it if their attention had been called to suggest it changes. Did the charge itself change? It did. How did it change? Well, because the indictment specifically alleged knowingly. It's sort of a circular problem. If the kind of injury that the instruction was is a subset of knowing, which it appears to be, then it was encompassed. Well, I'm glad you want to raise that point. In reviewing the briefs again just last night, it occurred to me that that was – it didn't frankly dawn on me that that was what the government was arguing. It's my understanding of what the government is arguing. This is a subset of knowing. And I think that it's not. And the reason I don't believe it is because I think that a subset of knowing is willful blindness. And this is not a willful blindness case. In the first instance, one of the co-defendants specifically asked the court to instruct the jury with the definition of recklessness. And the court declined to do so. We know from the model penal code and virtually any – it's black-letter law that recklessness is a lesser mental state than knowing. And I think the exception to that that you're all referring to is it came to the willful blindness instruction. And I looked at Heredia, the case on that last night, and this will also be in the 28J letter, but this court very specifically said in Heredia that recklessness and negligence are two completely different things, whereas willful blindness is sort of a subset of knowledge. Recklessness is something else. And that is what the government – if the government wanted to convict Mr. Baker on a theory of recklessness, they should have asked the jury to return an indictment on the basis of recklessness. This is a lesser mental state that went to the jury and it was never passed upon by the grand jury. So the effect of this was to expand the conduct for which Mr. Baker could have been convicted. And what about the Love case? Is that not fairly close? The Love case is a variance case. And as I said at the beginning of my remarks, some of the language is inconsistent throughout the jurors' proofs. But in the government's brief, they specifically cited Love only with respect to variance. And after Ward, I'm conceding variance is not an issue here. This is a constructive amendment case. Love, although it cited some constructive amendment cases, the language of Love talked about variance. And, in fact, the Love court addressed prejudice. And there's no prejudice analysis in a constructive amendment case because it's automatic reversal. So the Love case is limited to the variance argument that it addressed. And I think the government agrees because that's how they framed it in their answer in the brief. Had subsequent cases limited Love to the variance context and not used the same reasoning in constructive amendment cases as well? I don't know that this has come up again, frankly, Your Honor. I do note that one of the cases that Love cited within it talked about that a defendant may be properly charged with recklessness. But that's my point exactly. Mr. Baker wasn't properly charged. And so with the extra time that you gave me, I think I may have two minutes left for rebuttal unless Your Honor has other questions. Okay. Thank you. Thank you, Your Honor. If it pleases the court, my name is Lawrence Litman, and I represent Albert Greenhouse Appellant. Mr. Greenhouse is a peculiar appellant in this matter as he was acquitted of the fraud, charges, and conspiracy, but was convicted of the sale of unregistered securities because of his conduct of soliciting investors through public telephone. Firstly, I would like to advise the court that appellant abandons the argument of appeal on conviction based on the change in the Securities Act. And after reading the brief of the government, accepts the position that that would not be grounds for overturning the conviction. I would like to say, however, that that does support the position that I've argued throughout the brief, that by the virtual act of the Congress and the Securities Commission decriminalizing or allowing the public solicitation to be done, supports the argument of what I would say de minimis offense, is that it is not the soliciting of the investors that is the fear or the risk in any securities registration issue. So as far as that point goes, as I say... So we should do away with the registration requirements? No, what I'm saying is that the solicitation in itself is not the fear or the risk of that particular securities requirement, in that there was a prohibition of soliciting investors by telephone, unless you register. Well, in fact, not unless you register. Can you tell me succinctly what your current argument is? The current argument is twofold. It's that the judge assessed Mr. Greenhouse in his sentence for loss to the victims. And it's argued in a twofold argument that that should not have been done. And the reason is, is firstly, the guideline section 2B1.1 it submitted would not be applicable. Although the appendix say that this particular charge should go to that section, that's what we use for a number of law for assessment, six points. And so we first argue that although these six points is used, none of the applicable enhancements should be applied. And there's an argument on that submitted that the reason is that if you look at the preamble of 2B1.1, it explains what this section is for. So it's essentially what you were saying before, that this isn't about fraud, is that why? It shouldn't be about what? It's about fraud, is that why? Why isn't it? There's no law? What are you saying? The Guideline Commission have to give some point of where they could put this particular offense. I understand that. What you're saying doesn't apply. Okay, it doesn't apply because it is not one of the types of offenses that is enunciated in the preamble of that section. It is not a fraud. It is not a property offense. It is not. Okay, but there's a cross-reference back. It's cross-referenced so that the only thing that should be used is the six points, and that's all that he should have been applicable to. Are you telling us, in effect, that the Guideline, what the Commission has provided is illogical, and hence the court should disregard it? No. I'm saying that what it does is it can't use every single offense as a separate thing. So it says use the one in this case. Is there a cross-reference for this offense? Yes. And it points to this guideline? Yes. And the district court applied the guideline. You don't say they applied the wrong guideline in terms of what the guidelines say. So what exactly is the legal flaw? The legal flaw is the application of the enhancements, which should be used. Are you saying that because the heading of 2B1.1 is larceny, embezzlement, et cetera, et cetera, and this is none of those, therefore it doesn't apply? Is that what you're saying? It should not apply to this offense as it relates to any enhancements, but only the number that's used. Is your argument based on the guidelines themselves or a case applying the guidelines or simply your own policy sense of what the import of the fraud acquittal should be? Yes, that's correct. Which one? You should only use the six points in calculating. Is that a guideline? You cut it there. Where is it coming from? If I read the guidelines, I'm not going to find anything. No, you won't. When you look to those arguments, you say that this is what they intended to use this particular section for, and you use an equivalent of that six points. And so we accept that six points should have been assessed. So why wouldn't it make a difference if the unregistered securities were an enormous amount? Are you saying, in effect, we should disregard the fact there might have been $3 billion worth of securities as opposed to $15,000 worth of securities? That's correct. It would be the act is the prohibition against public. But an act is a whole lot worse and has a whole lot more negative ramifications if it's $3 billion than if it's $15,000. Why isn't it rational to include some measure for the degree of loss in evaluating what the appropriate sentence should be? All right. Well, I'll move then to the second argument, which I submit the judge clearly erred in assessing, and that's the argument that the loss that was sustained by these investors was not caused by Mr. Greenhouse's activity or the crime that he was charged with. He was charged with selling unregistered securities through the telephone. That did not cause these investors to lose money. What caused the investors to lose money was the movie flop, and that's why there was no money to pay investors. That's true of all of the defendants, isn't it? Yes, but there was also money stolen. There was activity by other people, and that I would submit that had, and I did in the brief, had there been no fraud and been no error, there would be no loss by these investors. The mere fact that they were solicited into the investment by a telephone didn't create a loss. The loss was created by the investment itself. It didn't work, and that's the case of any investment in any movie that's known to be a high-risk production. The problem here is that it was an unregistered security, right? And the reason that you register securities is to give notice and information, right? Right. Or you do what was supposed to have been done in this case was a private placement memorandum, which allows you not to, because it's an exception to the registration requirement. If you issue a private placement memorandum, which was done in this case, and you have sophisticated investors, which was done in this case. Wait, where's the evidence of that in the record? The evidence of the sophisticated investors were the forms that the individual victim signed, saying that they were in excess of $1 million or their income. But isn't there a lot of evidence in the record that, in fact, these individuals had quite limited assets, quite limited experience, and that was known to? That was not known to Mr. Greenhouse. There was no evidence of the record that Mr. Greenhouse knew until trial. His victims did not testify. His victims testified. They did. But they did not say that they told Mr. Greenhouse that they didn't have this money. He only found out at trial that they didn't have this money. They misrepresented to him in order to get the investment. They could have said, no, I don't make that, in which case he would have declined the investment. So it's submitted that the causal connection, as this Court of Appeal has stated, must be twofold. It must be a but-for test, which we accept. But for him phoning these people, they wouldn't have invested. We accept that. But the next connection is the proximate cause, which he did not proximately cause this loss. What proximately caused this loss was the other fraudulent activity of the President stealing the money. Was that unforeseen to him or unforeseeable, and is that a requirement? Yes. It is a requirement that it be foreseen, and I submit it was not foreseeable that there would be all this theft by the owner. But he knew, for example, that these people were being told there were no commissions, and he got a commission, no? A large one, a very large one, as I recall. He knew that – no, that's not true. There's not in the record that he knew that these people were not being charged commissions. No. In fact, he – He knew that they were being told that there were going to be commissions. No, he didn't. There's no evidence of that. Or that they were going to get paid first before anybody else. No, there's no evidence of that. The only evidence of his knowledge of that was when he was a party to a conversation with Agler, who was a convicted and testified. Agler had testified that he wasn't receiving any commissions on this. There's no evidence that Greenhouse would have known what Agler was getting or not getting. So the point is that the enhancements – this is the – I would submit the best argument for the appellant. The enhancements that apply, if they apply, and you use that section, must be related to the offense charged and convicted of. Mr. Greenhouse was not charged – was charged but not convicted of fraud. He was not charged – I should say that I'm not watching your time. I don't know whether you're running over it or not. Oh, yes. And I would like a three-minute rebuttal. You've already used more than ten. All right. Well, I'm – so I'm not sure if you're – Well, I'm saying that you're cutting into your colleague's time. Okay. Then I'll just leave it at that. The most important point is that I've raised in those examples that there were intervening acts that caused this loss, not the mere solicitation of these investors. It wasn't the phone calls that Mr. Greenhouse brought in, which is what he was convicted of, that caused these investors that loss. Okay. Thank you. Yes. Go ahead. Good morning, Your Honors. Catherine Young from the Federal Public Defender's Office for Appellant David Nelson. I have four minutes, and I'd like to reserve one for rebuttal. So if the Court wants me to focus on any particular issue, given that there are a number of issues raised by Mr. Nelson, I'll be happy to do that directly. Otherwise, I'll just briefly touch on the many issues that he – challenges that he raises to his conviction and sentence. The first set of issues are evidentiary issues. Mr. Nelson claims the Vista Court erred in admitting irrelevant, inadmissible, and unduly prejudicial evidence. First, he challenges the 404B evidence regarding his subsequent employment at Big Gun. Mr. Nelson says that when he was interviewed by FBI agent Storer during the FBI raid on Cinnamor, agent Storer told him that there were two bad things about what Cinnamor had done wrong, changing distribution dates and not disclosing commissions. Mr. Nelson took that to heart. He thought that it was okay to go to another movie house as long as it didn't engage in those practices. He went with Slaniker to another house. But that's only if you believe everything he said, i.e., that he didn't know anything else. I mean, the main argument is that – the government's main argument is that he was a liar, and he didn't know much more than that. But that particular testimony of Mr. Nelson was not challenged. FBI agent Storer was present at trial, and he didn't challenge that that's what he told Mr. Nelson. But the government's ultimate position is that Nelson knew much more than that. No matter what the FBI agent told him, it was that Nelson knew much more than that about what was wrong with what was going on there. In fact, lied about saying that he didn't know more. In other words, your takeoff point is highly debatable on the record. Go ahead. Okay. I understand, Your Honor. But my point also was that the government did not prove that Big Gun was fraudulent or that while he was at Big Gun, Mr. Nelson made any misrepresentations. And when the government sought to introduce the evidence, the district court said repeatedly, you have to prove it's fraudulent, and he made misrepresentations, and he never did that. And therefore, we argue that that was unduly prejudicial. He also challenged the evidence regarding a check with the notation leads that Mr. Nelson claimed was a repayment of a personal loan. And Mr. Nelson said that he did not sell these. The opening brief proved that Mr. Nelson did not sell these, and therefore it wasn't proof that he was involved in another movie, Boiler Room. And the government's answering group just claims that they were entitled to introduce it because it did not have to be relevant to the nature of the charged offense. But that was a theory that was not presented to the district court. So we're claiming that that evidence should not have been introduced either. We also challenged the Agler lay opinion evidence. Alan Agler, who was also convicted, testified based upon the few dozen closers he met as well as his own personal experience. He was specifically asked to testify regarding all his experience and all the closers he had ever spoken to and said that no investor had ever made money and that everyone lied. And we claim that this was unduly prejudicial because he was designated to testify as a recipient witness and instead gave lay opinion testimony far beyond the scope of lay opinion, and it was unduly prejudicial. We also challenged the victim impact evidence that the government introduced that was irrelevant as well. Specifically which impact evidence do you challenge, and what's the standard of review given that a lot of it was never objected to? If it was not objected to, it would be plain error. We were challenging the testimony from Mr. Bittercoffer. He said it was a financial hardship. It was terrible. He could not pay his bills. He had been advised to declare bankruptcy. Mr. Eliasson said it was a total hardship. It was a very big hardship. The government pursued this even though it was not relevant to any issue. Were those his direct victims? I mean, the victim testimony that seemed most out of line was the morale testimony, but that was not his. No, Mr. Nelson had nothing to do with that individually, Your Honor. We also challenged inadmissible hearsay regarding conference calls because the government could not find any witness who could testify directly that Mr. Nelson was aware of the use of shills on conference calls. So instead they used a hearsay testimony that one closer referred to from another closer. And I think, although I haven't been keeping very good time, that I may be wrong. Of course, he had the script. There was the evidence of the script that was found on his computer with the handwriting similarity to a known ---- There was evidence on a script. He said that he had not seen that particular script because he had inherited the computer from someone else. I understand that's what he said, but that goes to Judge Berzon's earlier point. The jury didn't have to believe what he said. No, I understand, Your Honor. We were just challenging what we claim to be the jury instructions as well. Since I'm running out of time, if there are no further questions. Thank you, Your Honor. You guys have done a fairly good job of moving this along, so thank you. Good morning, Your Honors. Russell Babcock for Mr. Testimony. First of all, I'd like to distinguish my case procedurally. This was a guilty plea case, and I do want to point out that the sentence was below the guidelines, but I would submit on the comments of my first counsel that spoke on that issue. We need to look at what Mr. Testimony pled to. He pled to one wire fraud count, and notably there was not any mention of the Californian people, the Lloyd operation. He pled to this one count. It was not a conspiracy count that he pled to. Can you help me out on how Blitz is different from your case? At the telemarketing relevant conduct case, what factors are Blitz-like and what factors are more like Studley, which is the case you seem to rely on? What happened in the United States versus Blitz at page 1013, the court relied upon the fact that it depended on the success of the entire operation for the financial compensation. This was not the case with the California operation whatsoever. I think that's what distinguishes it. The Florida operation, obviously Mr. Testimony was part of that, but there's really no nexus with the California operation, so that's where we've got the big difference here. What about the reloads of his clients for which in California that he got commission payments for, as I read the record? The district court at ER 23 specifically rejected the finding that the defendant participated in any of the reloading of his investors. He didn't participate, but he knew that they were being reloaded, it appears, and he got money as a result. I don't think that that's necessarily enough. Looking at the Studley reasoning and also even looking at the case that Your Honor cited, I think there needs to be more than that. There needs to be active participation. One way to look at this is really we've got two conspiracies going on. We've got Mr. Sellers here at the top and there's a connection over to California to Lloyd, and then we've got Mr. Sellers and we've got it going over to Florida, but there's no bridge between the two whatsoever. I agree. At best, you'd think that to the degree he got money from Lloyd, he might be responsible for those sales, but they held him for everything, is that right? Correct. They held him for everything. The whole enchilada, it was $9.5 million, and that certainly drove the guy. And what does the record show about his own sales? His own sales were in the range of $1.5 to $2 million, and when I say his own sales, I'm talking about the people that he worked with and he accepts responsibility. So the entire Florida office, for the period of his employment, you would agree is properly considered his relevant conduct, plus whatever money he derived personally from the reloading of his earlier victims by the L.A. office. Is that where you think the line should be drawn? Yes, I think that is where the line should be drawn, and I think that when he changed his plea, that's what he was thinking as well, and then all of a sudden he found himself tagged with $9.5 million of restitution, and the guidelines being driven by all these other individuals. There is a, in 2B1, there's an example that's given regarding drug dealers, and to paraphrase it, I think it's a very good example. It would be, for instance, if I engaged in drug dealing in the San Diego area with a learning colleague, and then I knew that that colleague went up to San Francisco on the weekend and did exactly the same thing, but I'm really not part of it, and I have full knowledge of it, it's foreseeable to me, the law and all these cases cited in my brief say that I am still not responsible for that. So what I ask the court to do is hold Mr. Keskemity responsible for what he did do, which was pleading the one wire fraud count for all the conduct that he did in Florida in this case. Thank you. Thank you. And you now have one minute. Yes, good morning. Thank you. I'm happy to be here, and I think I need about one minute. Mr. Edward Robinson for Mr. Lloyd. Mr. Lloyd made an argument sentencing that he had a good faith belief in the likely success of the movie Ventures. I've set forth in my brief the reasons why he had that good faith belief and the things that he did in furtherance of that good faith belief. And the relevance of that is? It goes to the nature and circumstances of the offense. I didn't contest the guideline. Is this a 3553 argument? It's a 3553 argument, Your Honor. And the court maybe inartfully characterized my argument that Mr. Lloyd had a good faith belief in the likely success of the Venture as irrelevant towards sentencing. The court then did list a number of aggravating factors under 3553 as to why Mr. Lloyd was acting fraudulently. Well, they included things like teaching people how to lie. Mutifying, I think, was the word. That's true. Those are pretty aggravating, aggravating factors. They're aggravating. I agree with that. Those factors are also taken into account with the guidelines. But in any event, when the court- Aren't they also somewhat inconsistent with their faith? Pardon me? Aren't they also somewhat inconsistent with their faith? Objective good faith, yes, if I'm raising a defense to fraud, but I wasn't. I was saying subjectively Mr. Lloyd believed that the movie had a good chance of producing income. He lied. He pled guilty to two counts of fraud. We didn't contest the fact that he said he was afraid, just like mutifying, that he was out for the money. And the argument essentially was that given the fact that Mr. Lloyd did commit fraud, given the fact that he did use some very sharp tactics in defrauding these people, that those factors do drive the guidelines, which he didn't object to, and that a substantial sentence was warranted. But we did take the position that the nature and circumstances of the offense under 3553 supported a variance downward because he did show, through his efforts, loaning the money, leaving Cinemore when he became aware of the fact that Cinemore was not going to distribute the films. And there was a variance downward. There was a variance downward. If I glean now, I have struggled a little bit. It seems to me your argument is that, well, there was a variance downward, but the court didn't explain well enough the reason for that downward variation, so we ought to throw it out and do it again. Is that your argument? That's our procedural argument, yes. And I say that because of this, Your Honor. I acknowledge that it's unique, and I may be charitable to my position. But the court said... Charitable is what they wish for. The sentencing judge said that he found that the guideline range did not adequately take into consideration the specific facts and circumstances of the case. Judge Walter made an institutional... He said from an institutional standpoint, most district court judges no longer like the fraud table, and therefore they are varying from the fraud table. Judge Walter also said, in support of the downward variance, that the specific facts and circumstances of the case support a variance. Everything that he said prior to that was an aggravation when he was talking about under 3553, the nature and circumstances of the offense. He deemed Mr. Lloyd's argument that there was enough evidence to support a variance under... You're way over your one minute. In any event, I would argue that the substantive reasonableness of the offense, you've got 13 years, is unreasonable, and there was not an adequate explanation for the discrepancy between the guidelines and the variance, particularly given what was presented to the court, and Judge Walter's comments in justifying the downward variance. Okay. Thank you very much. Thank all of you. And then there's Lou. There's only one of you, right? May it please the court? My name is Ellen Lindsey. I'm an assistant United States attorney in Los Angeles, and I did try the case. So there's so many issues. What I thought I would do is just respond to what appeared to me to be the court's biggest concerns from the government's point of view, but obviously please interrupt me and tell me otherwise. I felt from Judge Graber some hostility. We're fungible. Well, that was a good way to start the argument, wasn't it? Okay. Okay. From Judge Berzon, I felt some testimony, some hostility towards the victim impact testimony. I don't necessarily have hostility. Okay. I can tell you exactly what I think. What I think is that most of it was probably wrong but benign, but that the route testimony was probably not benign and wrong, but I'm not sure how that relates to any of these particular people. Well, yes, because I can tell you briefly why the route testimony was relevant, and that was that Defendant Greenhouse was developing this argument about how he took great care of his, well, I would call them victims. He would call them investors. He took great care of his investors. Investors. Yes. Rao and Antico were engaged. Of course, Mr. Greenhouse was acquitted of the fraud charges. Exactly. So if you're going to say that that is the most egregious or the most prejudicial victim impact testimony, they acquitted him of the fraud. So I think it demonstrates that the victim impact testimony didn't really have an effect, an undue emotional effect on the jury, because if it had, that very, very sad testimony would have gone to Mr. Greenhouse. So that was that issue. I wanted to talk a little bit about the Spedley Blitz issue for Mr. Kaskamaty and Judge Berzon's comment that maybe it should be that, yes, he does get stuck with some of the Lloyd loss, but only maybe those people who were reloaded, and he gets the commission. It does seem quite extreme when this guy is off in Florida and doing, it doesn't seem to be, it's not part of his conference calls, is that right? No. And he is not in daily contact with any of these people. Well, I would. That may be sellers. Sellers, but I. And so he, the only real connection seems to be this, and I gather there isn't proof or a finding that he himself transmitted the names of people for so-called reloading, but that some of his people were, quote, reloaded, because sellers knew who they were, I guess. Is that the point? Well, yes. Sellers would have the information, because obviously. But he wasn't instigating it as such, or there's no evidence that he was. The judge didn't find that he was, right? Kaskamaty, that's correct. So why is he, why is this like Blitzworth? I understand that they were all sitting in one room, and they were in daily contact, and their remuneration depended on each other. It was basically a pool. None of that is true here. I would disagree with that. And I think, first of all, personally, I think Studley is wrong, personally. But it's a Second Circuit case. Forget Studley. Okay. Let's just look at Genovo, and is it governed by Blitz? And if it's not governed by Blitz, why should it be? Well, I think it is covered by Blitz, but also maybe more on point, it's covered by the Boatner case, and I believe that it's either the Fifth Circuit or the Seventh Circuit. But the Boatner case is the one where there was a staged accident, and then everybody pursued their own separate insurance claims, and the circuit held that, yes, they should be responsible for each other's. And the key is, just as the key is here, that they were working. They staged the accident together, is that right? Well, yes, but then you could say they had the private placement memorandums, they had the brochures, they had all of the promotional materials, they had the common actors and what they were saying about the movie. But the key is that they were working together for a common goal. Well, what is the common goal as far as Mr. Caschimedi is concerned? Because it doesn't seem that he got more money, that the success of the Florida fundraising did not seem to depend on the success of the L.A. fundraising. Well, it does, Your Honor, and that is because a certain amount of money has to be raised in order for the movie to get made at all. At least one major instance it wasn't made at all. Well, but Caschimedi's movies were made. That's in the cinema. I understand that, but that just proves that that wasn't central to anything, whether the movie was made or wasn't. Well, except that if the movie is being made, they're raising more money while it's being made. It's also a lulling, Your Honor. And so it is the working together for the common goal, as in the Boatner case. And then there's another aspect to it, and that is that Mr. Caschimedi did not just benefit from the conference calls because he got some commission from them. He benefited because the conference calls not only raised more money, but the conference calls were also a lulling technique that kept the victims from feeling ignored, that kept them calm, that fed them false information to keep them from going to the authorities. So when you say that, well, maybe Caschimedi benefited because of the commissions, he actually benefited from the whole thing. So it's not only the working for the conference calls. Did he know about the conference calls? Well, the judge found that he didn't, which I may or may not agree with. I think contrary to what the defendant says. Because that can't be the basis for the judge's determination. No. The judge's determination was that he was part of the jointly undertaken criminal activity with this common goal of working towards raising. Hi. No, keep going. Oh, okay. Sorry. I'm going to be calling you Judge Clifton the way I'm going. That would really be helpful. So I think it's good to contrast this with the drug-type cases. Because in one of these drug-type cases, you have the kingpin who has the drugs and he gives them to his people on the street, and they all go out and sell. And it doesn't matter for this drug runner if this drug runner sells or not. However, for Keskemity, it did matter that these conference calls were happening because he was benefiting from the. I think the fact that he didn't know about them and the judge found he didn't or the judge found he didn't know about them to back that up? It doesn't matter whether he knows of conference calls, but he knows that something in the main office is occurring to keep his victims from going to the police and from exposing it. Does he know that? Because the judge seems to find that he doesn't. No, the judge just found that he didn't know about the conference calls. But we had, in that case, there was a defendant named Robert Ramirez. And Robert Ramirez's whole job was to do customer service, customer relations. And Keskemity eventually started doing that himself. In which office was Ramirez? Well, Ramirez was in Los Angeles. Okay. But he started doing it for his own operation. Keskemity. Right. No, he started doing it for all of the operation, which just shows again that they're joined together for this common goal. Where will I find in the record evidence that Keskemity was calling or arranging conference calls for L.A. customers to lull them? Your Honor, I am actually not sure if it would be in the record, but the fact that he was customer service and it certainly – if you are customer service, it was – We can't base – we can't say the sentence is reasonable based on something that the judge didn't find or something that's not in the record. Well, the judge did find that Keskemity benefited from the whole. And benefiting from the whole operation is different from just knowing whether there were conference calls or not. He's raising money in Florida. He knows money is being raised elsewhere. Correct. How is he benefited by the knowledge that money is being raised elsewhere? Well, he's benefited, A, in the fact that the organization continues to go on. And also in these cases, the money, the overhead was eating everything up. So the more money coming in, there's more – But he's not getting that money. Well, but he's getting the brochures that are being printed by the main organization. He's getting the PPMs. He's submitting his paperwork to the main organization. It's all – all the money is – Tell me what is the exact – I mean, one consequence of this difference between 1.5 and 2 million to almost 9 million is restitution. What is the sentencing? What – how many levels? And I guess that would lead into another argument is if the sentence is below the guidelines that he would get anyway. The government argued that for several instances here. Do you have a case saying that? Isn't our case law absolutely firm on the fact that if the calculation was incorrect, that you go back to the district judge? I think – Even if it's below guidelines, even if it's within guidelines, no matter what it is? I think the government only makes that argument in the context of plain error, Your Honor, where the defendant has to show a prejudice and an offense to the judicial system, and where you have a situation where the sentence is below the guidelines, even if you take into account – Is this plain error here? Are you making an objection to this? No. So why are you mentioning it? I thought you were about to – did you not – were you not about to say that it was all harsh? You know, that – I was not going to say it in connection with this, but just to put a little ticker there for the discussion in the Baker context. Well, what about in this context? Well, because – no, Your Honor. I think we would definitely concede that if the guidelines are wrong, you have to go back. Well, he got a 20-level enhancement for the fraud loss driven by the finding that the relevant conduct extended to Los Angeles, as I read it, and then he got a six-level enhancement for the large number of victims that would have covered both offices. Right. So he's getting hit pretty hard for guideline calculations. Right, and I think no matter what, if there is a guideline error, you have to go back. I think we've done a very good job of this. Okay. Thank you, Your Honor. So on the criminal history issue with Defendant Baker, I think what the government is saying here is that it is a plain error because he didn't object on the footnote or the Note 11 issue. And since it's plain error, it's up to him to demonstrate that he was prejudiced. If he had raised the error in the district court, then the two other questions – this is very confusing. But the questions are whether for the revocation, the revocations were imposed on the same day, and there's some question in the record as to that, and also whether it was the same conduct that caused the revocation. If it was a remand, we'll find that out. We'll remand it under the open record and it'll all get done again. Well, but on plain error, he didn't raise it below. So there's no reason to remand because he can't show that there was an – But the premise usually is, as you've conceded, the standard case is an error in calculation. If you go back and find out what would have happened, you re-sentence. This is plain error, so there's an obligation on defendant to establish some degree of prejudice. But in the ordinary case, we start with a correct guidelines calculation. Is there anything in particular about this case that tells us that, no, this change in calculation would not have had any impact on what the district court did? Or are we just in a state of ignorance? We really don't know. And burden's on defendant, so defendant loses. No, I think what I'm saying is that there is no error in the guideline calculation. Wait a minute. I thought you already told us that, yes, there is an error in the guideline calculation. No, not for – no, no, no, no. I think what I'm saying is that I would concede if there's an error in the guideline calculation, under normal review, you do have to remand. If there's that procedural error. So you're saying there isn't an error or there is an error. I thought your 28-J letter said there was an error. No, no, no, no. The 28-J letter acknowledged one prong of the analysis for the footnote 11. And I may be able to articulate this a little more clearly. Well, as I read the letter, it's not a very long letter, it's basically saying, I thought, but I said, which is that you're saying that burden's on defendant to show prejudice, defendant can't show prejudice because we can't be sure what the judge would have done, hence no plain error. Is that as far as the argument goes? No, I believe what the letter is saying is that the TSR – that the defendant cannot show a guidelines error. Oh, because of the date. Right, the date and the amount of conduct. But I think – There's a fair amount in the record to support a conclusion that this was on the same date and it was for the same conduct, isn't there? Well, I think the problem is that it would be a supposition and that's not plain error. I think it's, you know, it's like, yeah, it looks that way, but I don't think that's plain error. That's as strong as you think it is. I think, yes, exactly, that's kind of how strong it is. And that the burden is on the defendant since he didn't object below on that particular basis. Because if he had objected below, it would have allowed the parties and the probation officer to go and look more closely and to see if there is an error just in the fact that it says they were on different dates, et cetera. But since the defendant didn't object, he has to show that there was an error. And I don't – Did it question in any way whether the sentences were on different dates or whether the offense or, in this instance, the issue that led to the revocation was on the same date? It's a date. There's what? Oh, it would be the date of the offense and whether the revocation was for the same conduct. And I think – But the different dates doesn't go to the date of the offense, right? I mean, if there's a discrepancy there, it's not anything about an offense. Right. Right. But the – Nobody suggested he did anything else in that time frame other than – Right. So – But then there – It's not only a guess. It's a pretty good guess. Even if there's a discrepancy in the dates as to when the sentences were imposed, it doesn't really matter. Right. And then it's – but it's also whether the revocation was for the same conduct. Because I think there were, like, five offenses that he committed. And so – but I think it's a pretty good guess. It doesn't make plain error. So I think that's why the standard of review matters. And the defendant did not object on that particular case. What is this – the prejudice standard or substantial harm, whatever the standard is for plain error? It's not even more likely than not. It's just a pretty good guess. Isn't that really what the standard is? A pretty good guess? Well, no. The defendant has to show prejudice. Right. By how much? By what standard? 30 months? Well, it has – well, I don't think that would be – That's the difference in the guideline calculation that results. From a – oh, okay. From the criminal history calculation being incorrect. Well, I think – okay. I still think it's the defendant's burden to show that there actually was an annex. But the question is burden – let's say it's – I don't even think it's more likely than not burden. It's something less than that. But say it was more likely than not. Well, I think he has to show that it offends the judicial sensibility. I think that's a pretty high – All right. But maybe you're – We're easily offended sometimes by those questions. If you want to know what's troubling me a little bit, the – Al Gers, that is the name, laid testimony about this guy who was testifying to things that – everything that ever happened in a boiler room. Agler. Agler. Alan Agler. Well, he was testifying from his own personal knowledge. Well, first of all, that's far from self-apparent. I think it is because – Well, how would he know? He says, for example, that the – that one of the things he testified to was that the victims don't read these documents. How would he know that other than somebody told him? Because he testified that he relies on the fact that the victims don't read the PPM because if they do, they ask him the hard question. So it's not – he is not testifying to the victims told me they didn't read the PPM. He's testifying to I was able to sell this way because, in my experience, they don't read the PPM. And so I will tell them these things and they don't ask the right questions. They don't know what to say. They don't know what to ask. They ignore disclosures. They ignore disclosures. And he said something about they've never – none of these things have ever made money. How would he know that? He testified, in my experience, the movie rooms that I've worked in, my victims have never made money. The reason he would know that is not because they tell him I made money or I didn't. It's that if distributions go out, he is able to very easily reload. They all want the victims to get money back so that they can try to get them to send in more money. So all of these things are in his experience, and he's not – he didn't testify. If you look at the record, all the questions were in your experience, X. And he testifies, in my experience, the victims didn't read the PPM because I could sell them and I could tell them there was no risk, even though the PPM said risk. In my experience, they didn't make any money because I was having to lull them and give them excuses. Because that's what the conference calls were for, to lull them and give them excuses. This is why you're not getting any money back yet, blah, blah, blah. And meanwhile, while we're talking about that, let's invest some more money. He testified that everybody lies. That would be his experience of working in the room and reloading victims who have been pitched by other people. So in other words, it was all within his own experience and not hearsay that he was testifying to. But was it really – I mean, on some level, it's within his own experience because he has no basis to say beyond his own experience. But his testimony really didn't seem confined in that way. It was pretty broad terms. Is it well known in your experience that investors are relying upon what the salesman says? That's not a narrow question with regard to what happens to people you've dealt with. Is that just the common understanding in the room? Well, I think that's a fair question, though. In his experience, you're in the room and – But he's not talking necessarily about the room that defendants are in. He's talking about his experience generally. Correct. Well, why isn't that a purported expert opinion? What does his testimony have to do with these defendants? Because he is testifying about the fact that these movie rooms all operate in a certain fashion and in a certain way. And also, the answers to these questions were not objected to as wrongful expert opinion. So these also are judged under the plain error standard. And from my experience, everybody that I ever worked with will always stretch the truth and make out outright lies, especially in certain techniques. How could he testify to that, that everybody was lying? It's in his experience to what he – The expert is testifying in his experience. This does away with the concept of expert testimony all the time. No, because an expert testimony is based upon hearsay and a specialized knowledge. This is not a specialized knowledge. This is like the case that I cite where somebody is talking about proposed profits from the business and that's because they know their business. It was the same thing for – But the common practice in your experience and the people that you spoke with that you were making from investors, yes, i.e., it wasn't all in his experience. How could it be? Well, in this case, though, we had extremely detailed testimony about how the defendants were hiding their commissions. From each of the defendants who testified or, sorry, who went to trial, all of their victims testified that they weren't told about commissions, except one who was told by Mr. Greenhouse that his commission – In your experience, do investors read this and understand it? In my experience, the vast majority of the people invest do not read the placement or if they do read it on a limited basis, they have no idea what it says. And is that a well-known fact in the rooms that you worked in? Absolutely. Now, you had a lot of interesting things to say about where he got that from, but none of them are in here. I'm sorry, Your Honor, I think – In other words, he testified absolutely that it's a well-known fact in the rooms that he worked in that people do not read the placement memorandum and they have no idea what it says. You had a very interesting set of explanations for how he knows that, but they don't seem to be in here. I think that they do come elsewhere in his testimony. He does talk about the salesman understanding that the investors don't rely on – He knows what he understands. How does he know what other salespeople understand? Well, I think then you could say that he would be talking to the other salesmen in those boiler rooms who were co-conspirators of his, and it wouldn't be hearsay. And what the court said is that expert testimony is based on hearsay and specialized knowledge. This was just his knowledge, as the district judge found. This was just his knowledge from working in these rooms. The other thing I would say – What are these rooms? Well, he testified as to the different boiler rooms that he'd worked in. Movie boiler rooms. Movie boiler rooms in general. What are meant to do with these defendants? Well, I think it would depend on what part of his testimony you're talking about, and I think that would go to some of their knowledge and experience, their intent to defraud. And a lot of the defense was, for example, that the victims should have read the PPM, so it became relevant that the victims don't read the PPM, and Agler knew this because of the way he was able to sell. I don't think the issue is relevance. I think the issue is whether it's permissible 701 testimony, or if it is impermissible, unnoticed 702 testimony. Well, first of all, it wasn't objected to that way, so it would be a plain error. It was objected to intermittently, and then at the end they said, we had no notice that he was going to do this, and we wanted it all stricken. And he didn't have notice, did they? It was objected to not on that basis, though. I thought it was objected to on the ground that he was testifying as an expert. No, no, only at the very end. I thought it was one such objection. Only at the very end. It was a motion to strike the whole testimony only at the very end. It was the intermittent objections were relevance and that kind of thing. They were not the proper objections. And to the extent that the defendants weren't on notice, I mean, they had received all of Mr. Agler's memorandums of interview, and they knew he was going to testify. Not in this regard. No. But the final thing that I would say as to that is that Mr. Agler was really mostly testifying about Mr. Greenhouse because he didn't work with Mr. Baker directly, and he didn't work with Mr. Nelson directly, and Mr. Greenhouse, again, was the whole problem with his testimony, which is insofar as he testified specifically, yes, but insofar as he was standing up there and talking about what everybody knows about everybody, then how could it be limited to that? Well, I think the argument that I was trying to make, Your Honor, is that it obviously wasn't, even if it was wrongful, even if it was error, it obviously wasn't prejudicial because Mr. Greenhouse, who Mr. Agler was testifying very specifically as to, he was acquitted of the fraud. And then the other thing that I think is very important to look at is the Mr. Nelson and Mr. Baker on the fraud. For Mr. Baker, you have the tape where he – Let me ask you one thing about Nelson. With regard to Nelson, you put into your briefs this handwriting thing. Yes, which was supposed to have color in it, did it? It did have color, but did the jury see it that way? What the jury saw was in closing we put PowerPoint slides of the known handwriting against the – You had the circles and the lines and everything that wasn't the version we got? No, no. We just – we focused – we were able to focus in the PowerPoint, and it was just – And this was also peculiar because ordinarily wouldn't you have a handwriting expert to do that? I mean, I don't know whether that's the same case. Could be. Well, that's how I argued it in closing that we didn't have a handwriting expert, but you could certainly – this circuit does not require a handwriting expert. The jury is perfectly able to tell, and this was – the resemblance was so – You gave us something that wasn't before the jury. I found it very disturbing. I'm sorry? You gave us something that was not before the jury, i.e. these lines and circles and so on. You believe that's improper, Your Honor? Improper to me. But I think we made it clear, though, that we were just showing this for the courts, but the jury – we can't really put the PowerPoint slides in there. You're telling me that everything that – all the circles and all the lines were essentially the same as the PowerPoint slides? Yes, Your Honor. Yes, I mean, we put it up – Each circle that you showed me and all the lines and so on were shown to the jury that way? As I recall, it was me putting up the PowerPoint and saying, look at this and look at this and look at this. And they were the same comparisons? I cannot say for certain that every single little circle was, but the main comparison, and the one that made – actually made somebody in the courtroom gasp when it was put up was the word wife. That was the big comparison. Referring to the wife's IRA? Yes, the wife's IRA and then the known writing of the person at Big Gun. And so that was kind of the smoking gun. We didn't have a handwriting expert because I did not anticipate at all that Mr. Nelson would actually get up and say that he wasn't – I had no idea he was going to say that. And it was crazy. So the handwriting thing came up at the end. But I don't think you need a handwriting expert for the jury to be able to look at those and say, that's the same person that wrote that. Yeah, that was interesting. We're out of time, and I guess the other side is going to get a little extra time. If you want to take another minute or so, you may, but that's about it. Well, may I ask, Your Honor, what is the most troubling issue? Well, we went through them. But one other thing that would help me to hear a little bit of that is this Big Gun testimony, i.e., does it matter? Was there evidence that the Big Gun operation was fraudulent? Does that matter? First of all, I think this Court is very clear that if there's no evidence of fraud, it simply isn't prejudicial, and it's not an error. It doesn't make a whole lot of sense, does it? Because you're obviously implying that there was fraud. That's why you were putting it on. You see, you can have an allegation of fraud without proof of fraud. Therefore, the fact that the jury might have thought there was fraud, even though there wasn't fraud, wasn't proof of fraud, is the problem. It's not the answer. Well, I think, first of all, that what I'm saying is that the defendant's exact argument in that regard has been rejected by this Court in the Blitz case, in the Melvin case. So I think you would have to overrule another panel in order to say it does matter. But I do think there was evidence of fraud, that this was an old man that Mr. Nelson went in and took him for much more money than he really had to give, that nobody got any money back from the Big Gun raids, et cetera. And what about the check to Mr. Slaniker, the one that has the 19 months after the fact? Will you address that? Again, it said leads. Now, we didn't, again, until trial, until the check was already in evidence, we didn't know that Nelson was going to come up with this explanation that it was a personal loan and that it really wasn't leads. But when you have somebody who's arguing that he never would have been involved in fraudulent telemarketing had he known that they really weren't doing what they said, I do think it's relevant. The cases say 19 months is not too long, that he's actually going on and selling leads and he testified himself that he wouldn't have worked there because it was a fraudulent operation.  Thank you very much. Thank you very much, Your Honors. And we will hear from the rebuttal lawyers. Thank you, Your Honors. A couple of discrete points. First of all, with respect to the Agler testimony, I frankly do not understand how the government can suggest that this was plain error or unobjected to. Counsel for Mr. Baker specifically objected to the foundation, lack of foundation for that opinion testimony twice at ER 139 and again at ER 146. Does it matter if Mr. Agler could have qualified as an expert? Well, it does because they weren't provided notice. And then at the end of the testimony, after already having two of his foundation objections overruled, Counsel for Mr. Baker moved to strike the opinion testimony specifically on the basis that it was unnoticed opinion testimony and that he did not have an opportunity to vet that testimony under Daubert or Kumho Tire. So how the government can suggest that this was somehow unobjected to, it's hard for me to comprehend that. With respect to the suggestion that the record is ambiguous for Mr. Baker because Mr. Baker failed to object, that also is frankly in this statement of the record. Mr. Baker's counsel specifically objected that he should not receive criminal history points for both revocation sentences because they occurred on the same day. Now, he did not make the specific argument that I made under Application Note 11, but he did specifically object that the sentences occurred on the same day so they shouldn't both count. In response to that, the probation office filed an addendum to the pre-sentence report, which the government adopted, which said, too bad you lose because there's an intervening arrest. And then the court later adopted that, and that is at ER 32 and SER 1. The court, I believe it's at ER 32, where the court expressly adopted the position of the government and the probation office that because there was an intervening arrest, both scored. So if there's any ambiguity in the record, which the only logical interpretation is that both sentences were imposed on the same day, that ambiguity is the fault of the government in probation for not fleshing out the record, not Mr. Baker. So with that, I appreciate your time. Thank you. I will be really brief, Your Honor. I just wanted to address some of the points that Ms. Lindsey raised. Judge Berzon said that she thought the victim impact testimony was wrong but benign, and Ms. Lindsey said that the fact that there was the Rao testimony, which was so horrific, and Mr. Greenhouse was still not convicted of fraud shows that the victim impact testimony had no impact. But in fact, Mr. Greenhouse, although I'm not that familiar with his case, he was in Florida. I think there was evidence he didn't even know the PPN. Here you've got disputed evidence. Nelson said, I was told the things that I relayed. I was told they were pre-sales, and so I relayed that information to investors. Here you've got disputed evidence, and that's where some prejudicial evidence like victim impact evidence can have an effect. I also wanted to address the Agler testimony. I thought it was about Greenhouse. It wasn't about any of the other defendants. It was about Greenhouse, but Ms. Lindsey was making the point that since the Rao evidence was about Greenhouse. I'm not arguing that, Your Honor. The second, Ms. Lindsey said that all the questions that were asked of Agler were asked in your experience, and in fact, as cited in my opening brief, the prosecutor asked Agler, now in all your own personal experience and all the closers who have worked in these rooms that you've spoken to, have you ever heard of any investor making money? So Agler was specifically asked not limited to his experience, but all the dozens of closers he'd talked about in all the other rooms that he'd talked with. The other thing I wanted to address was that the court asked Ms. Lindsey, was there evidence that Bigelon was fraudulent? And she said it was not prejudicial if it wasn't fraudulent, but in fact, as addressed in my reply, the government told the jury that the clearest evidence that Nelson had intended to defraud was that after the FBI raided Sydenham, Nelson went to work in another investment boiler room. So the government told the jury, this is the clearest evidence of fraud. And as I said, the rarest case that says a prosecutor's opinion carries with it the infirmature of the government and may induce the jury to trust the government's judgment rather than its own view of the evidence. The final point I wanted to make was that Ms. Lindsey said that Nelson took one of the investors at Big Gun for a certain amount of money. Nelson was only one of three closers, and it wasn't really, I think, established how much of the investment was attributable to Nelson as opposed to the two other closers. The other thing was I think that victim had something like $3 million. So you're not talking about someone who was necessarily taken for a lot of money or who was – it still doesn't mean that there were any lies told to them. Which victim was that? I think that was Richard – Lee Clark, I think, or Richard Clark. Do we know that lies were told to this person? We do not. We know he was old, and we know he was – No, and in fact, in seeking to introduce the evidence – He was that old. In seeking to introduce the evidence, the government produced some – an interview note of someone who had worked there. We said, no, if closers lied, they were fired. And in fact, the person who was in charge of it, you know, invested his own money to try to make up to the investors. There was no evidence of fraud or misrepresentation. Okay, thank you. Thank you. Is there one more person saying one more thing? You can say one more thing, and we'll admit it. Okay. I just want to sum up by saying when Robert Kiss' committee stepped up to the plate and pled guilty, he had no idea that he was going to be held liable for the California losses. It's huge because of the number of victims and the amount of money that's involved in this case. He has a debilitating disease, as is shown in the probation report, and there's a very good chance that the district court would have given him a much lower sentence if the guidelines had been calculated properly. In this particular case, I think the point that the court needs to go back to is the ER. The ER says it very, very clearly. The district court rejected the finding that the defendant participated in the reloading of his investors, finding that there was no evidence that he was even aware of it, and we have to accept that because the district court was in the position to see this. And they also find that he didn't know about the Congress calls. Correct. There's nothing that I can see in there as well, and the district court found that he did not in any way benefit from the calls. There was no benefit. So when you look at everything, he earned his commissions based on the Florida office solely. He ran the office in Florida. He did not coordinate with L.A. L.A. came into the picture many years later, and my client didn't even want Mr. Lloyd to be hired. He didn't share, knowingly share, any kind of investors list with Mr. Lloyd, and he did not know from the beginning that there was even going to be this whole California operation. They did not have to, as these other cases talk about, they were not all acting in concert. That's what distinguishes the Blitz and the Boatner and the Sin Line of cases, because in those cases, everybody was in it. I wouldn't be up here right now if they had shared their commissions on a national basis, but they didn't. This was about one Florida office for Mr. Trescometti. And last. One statement, Your Honors. If these securities would have been registered, there still would have been loss. The loss was not as a result of the lack of the registration or the selling of those securities. The investors knew that they could lose money. It was foreseeable to them that they could lose money, but it was not foreseeable that they would lose money because of the crime he had committed. He was convicted of selling unregistered securities, and the registration of those securities, had it been done, and done the proper way, would not have prevented the loss. There still would have been loss. Okay. Thank you very much. Thank all of you for a marathon and useful set of arguments, and we are in it.
judges: Rosenthal, BERZON, CLIFTON